UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

MELISSIA D BOUCHER,                  )
                                     )
              Plaintiff              )
                                     )
       v.                            )              Civ. No. 08-151-P-S
                                     )
HOPE LEBLANC, et al.,                )
                                     )
              Defendants             )

**RECOMMENDED DECISION ON MOTION
FOR SUMMARY JUDGMENT**

Melissa Boucher has filed a  pro se civil rights action complaining about inadequate

medical care for an injury she sustained at the Maine Correctional Center.   Before the court is a

motion for summary judgment filed by the three defendants (Doc. No. 44). The matter is now

ready for full consideration and I recommend that the Court grant the motion for summary

judgment for the following reasons.

*DISCUSSION*

***Boucher's Complaint Allegations***

In her complaint Boucher relates that in July 4, 2005, she was involved in a sack race at

the Maine Correctional Center where she was an inmate and she fell and hurt her back. She was

treated by Debra Smith, a nurse and a defendant in this action, for a pulled muscle. Over the next

two months she put in numerous medical call slips.  She alleges that Hope LeBlanc, a Physician

Assistant and defendant, saw her, informed her she had a pulled muscle, and refused to treat her

for anything else.

Boucher could not walk, stand, or get up.  Her roommate had to help her get dressed and

undressed daily and several correction officers assisted her in getting around the facility.

The three defendants, Boucher alleges, kept insisting that she had a pulled muscle. The entire right side of her leg began to go numb and she was suffering incredible, unnecessary pain. Boucher kept complaining to medical staff that something was seriously wrong. She informed LeBlanc, Smith, and Tritch, that she was in so much pain and that she could not get around on her own yet they refused to treat her any further. Le Blanc said "what do you want us to do?" and Boucher asked her to please send her out for an MRI and she refused.

This injury happened on July, 4, 2005, and Boucher maintains that she went without treatment until August 29, 2005. On August 30, 2005, she went to the hospital and explained her condition to the doctor on call. There was an MRI which showed that she had two herniated discs and that part of her spine was injured. She insists that if she had been treated promptly by the defendants after her injury her condition would not have gotten so bad. As it was, she had surgery to get her stable in order for her to be able to move on her own and she still needs to have a second surgery. Boucher seeks monetary compensation for her unnecessary physical and emotional suffering. Boucher did not complete the part of the form complaint that allows a plaintiff to sign under penalty of perjury.

### *Summary Judgment Standard*

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant[s are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). I "draw the relevant facts from the summary judgment record and rehearse them in the light most flattering to" Boucher. Bergeron v. Cabral, 560 F.3d 1, 4 (1st Cir. 2009) (citing Cox v. Hainey, 391 F.3d 25, 27 (1st Cir.2004 (quoting Federal Rule of Civil Procedure 56(c)). I draw all reasonable inferences in favor of Boucher, but where she bears the burden of proof, Boucher

2

"'must present definite, competent evidence' from which a reasonable jury could find in" her

favor" United States v. Union Bank For Sav. & Inv. (Jordan), 487 F.3d 8, 17 (1st Cir. 2007)

(quoting United States v. One Parcel of Real Prop., 960 F.2d 200, 204 (1st Cir. 1992)).

Boucher has not complied with District of Maine Local Rule 56.   Subsection (c) of Local Rule

56 provides:

> A party opposing a motion for summary judgment shall submit with its opposition
> a separate, short, and concise statement of material facts. The opposing statement
> shall admit, deny or qualify the facts by reference to each numbered paragraph of
> the moving party's statement of material facts and unless a fact is admitted, shall
> support each denial or qualification by a record citation as required by this rule.
> Each such statement shall begin with the designation "Admitted," "Denied," or
> "Qualified" and, in the case of an admission, shall end with such designation. The
> opposing statement may contain in a separately titled section additional facts,
> each set forth in a separately numbered paragraph and supported by a record
> citation as required by subsection (f) of this rule.

Dist. Me. Loc. R. 56(c).[1]

On July 22, 2009, I entered an order allowing a limited supplementation of the summary

judgment record by Boucher, explaining:

> While this court does not as a rule excuse pro se plaintiffs from complying
> with District of Maine Local Rule 56, it does in certain cases approach summary
> judgment disputes involving an incarcerated pro se party with some leniency.
> See; Clarke v. Blais, 473 F.Supp.2d 124, 128 -30 (D. Me. 2007) (Hornby, J.); see
> also Demmons v. Tritch, 484 F.Supp.2d 177, 182 -83 (D. Me. 2007) (Woodcock,
> J.).
>
> Because I do not feel that I can decide this motion for summary judgment
> fairly on the record before me, I am giving Boucher the opportunity to supplement

---

[1]   With regards to the defendants' motions, this court,
may not automatically grant a motion for summary judgment simply because the opposing party
failed to comply with a local rule requiring a response within a certain number of days. Rather, the
court must determine whether summary judgment is "appropriate," which means that it must
assure itself that the moving party's submission shows that "there is no genuine issue as to any
material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P.
56(c); see also Advisory Committee Note to Rule 56 ("Where the evidentiary matter in support of
the motion does not establish the absence of a genuine issue, summary judgment must be denied
even if no opposing evidentiary matter is presented.").
NEPSK, Inc. v. Town of Houlton, 283 F.3d 1, 7 -8 (1st Cir. 2002).

her response to the limited extent of amending her "Statement of Disputed
Material Facts" to provide cognizable record citations in support of her ten
paragraphs.  I note that not only does this court not have the exhibit cited by
Boucher, the defendants have not filed the entire Boucher Deposition but they
have filed the page cited in Paragraph 4 of Boucher's statement of facts.  If
Boucher seeks to rely on any other portion of her deposition in support of her
facts she must file the cited portion(s) with the court.  If Boucher seeks to rely on
her own representations as to her experiences as record support for her statement
of fact she must file an affidavit sworn under penalty of perjury. In fairness to the
defendants, Boucher is not permitted to file any summary judgment
supplementation beyond this amendment to her additional statement of facts.
Specifically, I am not permitting Boucher to file an opposing statement of
materials facts that admits, denies or qualifies defendants' original statements.  I
am giving her an opportunity to get her own record evidence in a cognizable form
in order to allow me to make the assessment Clarke v. Blais, would require.

(July 22, 2009, Order at 2-3) (emphasis added) (footnotes omitted).

Boucher has provided supplementation which includes a "Statement of Disputed Material
Facts" with some paragraphs that include record citations and which is notarized although not
sworn under penalty of perjury.  (Doc. No. 52-2.) The order cited above clearly cautioned
Boucher that she must comply with the oath requirement.  In that order I also pointed out to
Boucher that, with respect to her complaint, she had not completed the section of the form
complaint that allowed her to swear to the factual allegations under oath.  (July 22, 2009, Order
at 2 n.2.)  Furthermore, I previously entered an order on Boucher's initial motion to proceed in
forma pauperis requiring her to resubmit the application because she had only filed a single page
and the trust account statement was not certified.  Boucher complied by including an affidavit
that was notarized with the notary's representation that Boucher had made oath to the truth of the
forgoing affidavit. (Doc. No. 4 at 1.)  In contrast, the "Statement of Disputed Material Facts"
submitted by Boucher in response to my supplementation order simply includes the notary's
signature with the notation that the statement was signed before him.  (Doc. No. 52-2 at 3.)
Given this history I must assume that Boucher's decision to not swear her statement of facts

under oath is as likely a conscious choice as a negligent shortcoming.  Boucher has also

submitted three exhibits:  a sick call log and two admission/discharge records from the Maine

Medical Center.

### Facts

On July 4, 2005, while incarcerated at the Maine Correctional Center (MCC), Melissa

Boucher fell. (SMF ¶ 1.) Boucher initially felt discomfort in her abdomen and her low back,

primarily in the abdomen.  (Id. ¶ 2.)  On July 5, 2005, Boucher saw Nurse Practitioner Hope

LeBlanc, who arranged for her transport to the Emergency Department at Maine Medical Center

where she was evaluated for her complaints of abdominal and back pain. (Id. ¶ 3; SAMF ¶ 1;

July 5, 2005, Record, Doc. No. 52-4; Resp. SAMF ¶ 1.)  At Maine Medical Center Boucher was

told that her problem was not with her back, and "they mainly checked [her] stomach."  (SMF ¶

4.)  The Maine Medical Center form under the "impression" section note indicates:

"Abdominal/hip pain, probably Musculoskeletal from trauma.  If persistent symptoms, we will

need imaging."  (July 5, 2005, Record at 6; SAMF ¶ 1; Resp. SAMF ¶ 1.)[2]

Boucher represents that on July 5, 2005, she was discharged back to the prison with an

order for Oxycodone (5) Mg.  She was denied this medication at the prison, Debra Smith having

informed her that she could not have this medication at the prison.  (SAMF ¶ 5.)  The defendants

point out that there is no cognizable record citation for this factual statement.  (Resp. SAMF ¶ 5.)

For about the first two weeks after her fall, Boucher's back pain was mild. (SMF ¶ 5.)

Starting about two weeks after her fall and lasting for about two weeks, Boucher had more

severe back pain that went "through [her] whole body," which made it difficult to stand and

---

[2]      Boucher insists that this protocol was not adhered to in that her symptoms did go on to be excruciating to
the point that she could not function on her own to perform daily activities.  (SAMF ¶1.) The defendants point out
that this final observation is not supported by record citation.  (Resp. SAMF ¶ 1.)

move around, but she had no numbness. (Id. ¶ 6.)  About four weeks after her fall, i.e. in early August of 2005, Boucher started to experience some numbness in her left leg. (Id. ¶ 7.)[3]

There is no dispute that Boucher was prescribed Robaxin on August 26, 2005, by Dixie Knoll.  (SAMF ¶ 6; Resp. SAMF  ¶ 6.)  Boucher elaborates that this meant that she went without treatment from July 4 until August 26, three days before she was released from prison.  (SAMF ¶ 6.)[4]

Boucher was released from MCC on August 29, 2005. (SMF ¶ 8.) On August 30, 2005, Boucher presented to the Emergency Department at Maine Medical Center, where she was briefly examined, told she was "fine," and sent home.  (Id. ¶ 9; Boucher Dep.  at 40:9-14, 44:16-23. )  The MMC medical record reflects – inaccurately, according to Boucher – that Boucher described her pain as "dull" and "moderate"; that her pain was localized in the left side of her low back; and that the pain was not radiating into her legs.  (SMF ¶ 10; Resp. SAMF ¶ 2; SAMF ¶¶ 3,4; Resp. SAMF ¶¶ 3,4; Aug. 30, 2005, Record at 5; Boucher Dep. at 40-42 & 44-46.) Nor is there a dispute that she stated at this visit that she had severe low back pain, that, while she did not state that the pain radiated to her leg, she did state it radiated to her buttocks; she only had pain in her buttocks but it stopped at her legs.  (SAMF ¶ 3; Resp. SAMF ¶ 3; Aug. 30, 2005, Record at 5-6.)  The defendants point out the Boucher admits – and the MMC medical record accurately reflects-- that on August 30, 2005, she had no weakness in her legs and she reported no difficulty urinating or defecating.  (SMF ¶ 11; Resp. SAMF ¶ 2; Boucher Dep. at 40-41 & 45-46.)  While Boucher maintains that her leg was completely numb (SAMF ¶ 3) the defendants

---

[3]    All these facts are supported by citations to Boucher's deposition.
[4]    She further opines: "I would not[] have been given that until I had told them that I would be speaking to a lawyer and telling them that they were not treating me.  I should have been treated from the start with Robaxin not my last three days."  (Id.) The defendants again complain that there is not cognizable record support for this opinion and that there is no proper foundation as required by Federal Rule of Evidence 602.  (Resp. SAMF ¶ 6.)

6

insist that she does not have record support for this representation and that the August 30, 2005, record indicates under "neurological symptoms" that there was no "radiation to the leg" and no "sensori-motor loss." (Resp. SAMF ¶ 3; Aug. 30, 2005, Report at 6.)

Low back pain such as that which Boucher experienced and reported in July and August of 2005 can be attributed to a variety of factors, and seldom leads to surgery.  (SMF ¶ 12; Tritch Aff.  ¶1.)   Tritch represents that back pain is the second most common symptomatic reason for medical office visits in the United States. (SMF ¶ 13; Tritch Aff. ¶2.)  Diagnostic uncertainty exists even for those with back symptoms and well-described findings on an imaging study, as these findings are common even in patients without low back pain, and may be unrelated to the back pain. In other words, the fact that an MRI scan or other imaging study shows osteophytes, disc narrowing, or disc herniation does not necessarily mean that the patient's pain is the result of these conditions.  (SMF  ¶ 14; Tritch Aff.  ¶3.)  The basic physical examination for complaints of low back pain typically includes inspection of the back and posture, testing for range of motion, palpation of the spine, straight leg raising, and neurologic assessment of the L5 and S1 nerve roots.  (SMF ¶ 15; Tritch Aff. ¶ 4.)

Tritch relates that he vast majority of patients who complain of low back pain rapidly improve with medication and conservative treatment.  (SMF ¶ 20; Tritch Aff.  ¶6.)  Imaging studies are infrequently needed for patients with complaints of low back pain, and are unnecessary in the first four to six weeks unless there are progressive neurological findings or a high suspicion of a systemic etiology. (SMF ¶ 21; Tritch Aff.  ¶7.)   Referral of a patient with complaints of low back pain to an orthopedist or neurosurgeon is indicated when there are features of cauda equine syndrome, including bowel and bladder dysfunction, saddle anesthesia, and bilateral leg weakness and numbness; acute neurologic deficit; progressive or severe

7

neurologic deficit; neuromotor deficit that persists after four to six weeks of conservative therapy; or persistent sciatica, sensory deficit, or reflex loss after four to six weeks in a patient with a positive straight leg raising sign, consistent clinical findings, and favorable psychosocial circumstances. (SMF ¶ 22; Tritch Aff. ¶8. ) There is nothing in the records of the examinations performed in the Maine Medical Center Emergency Department on July 5, 2005, and on August 30, 2005, suggestive of abnormal neurologic testing. (SMF ¶ 23; Tritch Aff. ¶9.)

Boucher only went to see LeBlanc once regarding her complaints of back pain, and on that day LeBlanc physically examined her. (SMF ¶ 16; Boucher Dep. at 35:4-38:5.)  The examination of Boucher that LeBlanc performed was consistent with the basic, accepted physical examination for complaints of low back pain. (SMF ¶ 17; LeBlanc Aff. ¶5.)  The assessment of low back pain can be complicated in patients who distort, feign, or exaggerate symptoms, and these are particularly common in patients with psychological disorders. (SMF ¶18; Tritch Aff. ¶5.) Boucher has had a long history of narcotic abuse, and was known by the medical staff to be a "drug seeker."  (SMF ¶ 19; Boucher Dep. at 34:23-24, 59:2-18, & 64:21-65:10; SAMF ¶ 7; Resp. SAMF ¶ 7.)[5]

The Maine Medical Center record of the July 5, 2005, encounter also indicates that the patient's "pain appear[ed] out of proportion to the injury seen."  (SMF ¶ 24; Tritch Aff. ¶10. )  In the records of the examinations performed in the Maine Medical Center Emergency Department on July 5, 2005 and on August 30, 2005 there is no indication of any condition that would have

---

[5]     Boucher also maintains that she did not at any time during the period in question ask any medical staff for any type of medication; rather all she was asking for was to me taken out of the prison to have an x-ray or an MRI. (SAMF ¶ 7.)  She believes her surgical records prove that she was not drug seeking or making up her injuries but had a serious medical need.  (Id.) With respect to these latter representations, the defendant reiterate their assertion that they are not properly supported by record citation and that there is a want of foundation.  (Resp. SAMF ¶ 7.)

constituted a reason for urgent referral to an orthopedist or a neurosurgeon. (SMF ¶ 25; Tritch Aff. ¶11; LeBlanc Aff. ¶12.)

Assuming that any examinations performed during the period between July 5, 2005, and August 30, 2005, were consistent with the examinations performed on those dates, conservative treatment was entirely appropriate.  (SMF ¶ 26; Tritch Aff.  ¶12.)  The back pain Boucher experienced during the time between the onset of her pain and her release from MCC was something LeBlanc ordinarily would have managed conservatively. (SMF ¶27;  LeBlanc Aff. ¶10. ) Boucher did undergo the conservative treatment which would have been appropriate for her complaints of low back pain, consisting at least of non-steroidal anti-inflammatory medication and muscle relaxers. (SMF ¶ 28; LeBlanc Aff. ¶11; Boucher Dep. at 66:16-68:2.) Consistent with accepted standards of practice, LeBlanc would not likely have recommended x-rays or other forms of imaging for Boucher between the onset of her back pain and her release from MCC, unless there were progressive neurological findings or a high suspicion of a systemic etiology, neither of which were present by Boucher's own description. (SMF ¶ 29; LeBlanc Aff. ¶ 7.)

Consistent with accepted standards of practice, between the onset of Boucher's back pain and her release from MCC it is likely that LeBlanc would not have recommended referral of her to an orthopedist or neurosurgeon absent features of cauda equine syndrome --  including bowel and bladder dysfunction, saddle anesthesia, and bilateral leg weakness and numbness; acute neurologic deficit; progressive or severe neurologic deficit; persistent neuromotor deficit; or persistent sciatica, sensory deficit, or reflex loss --  none of which were present by Boucher's own description. (SMF ¶ 30; LeBlanc Aff. ¶8. ) As described by Boucher herself in her deposition, there was nothing about her condition in July and August of 2005 that would have

caused LeBlanc to think Boucher was at risk of serious harm or that she needed imaging or an urgent referral to an outside specialist. (SMF  ¶ 31; LeBlanc Aff.  ¶9.)

Boucher continued to work in the MCC kitchen throughout the months of July and August of 2005. (SMF ¶ 32; Boucher Dep. at 23:17-23.)  Boucher had meals delivered to her when she did not feel well enough to walk to the dining area, and she did not "go hungry" because of her injury. (SMF ¶ 33; Boucher Dep. at 22:21-29:5.)  Boucher does not recall having psychiatric problems as a result of not being able to walk to the medication line due to her back pain.  (SMF ¶ 34; Boucher Dep. at 26:21-29:11.)  Boucher states that she continued to work in the kitchen because there would be disciplinary action if she just stopped doing so without medical clearance, clearance which was unobtainable because she was told that there was nothing wrong with her.  (SAMF ¶ 8.)  She represents that she went into work but her two bosses did not have her do any work because it was apparent that her condition was painful and unstable.  (Id.)  Boucher explains that she could not always walk down to the cafeteria to eat, explaining that sometimes a guard would bring her crackers or she would give money to an inmate to go buy her something from the vending machine.  (SAMF ¶ 9.)  There were days that she would go without full meals or her medication.  (Id.)  The defendants reiterate that Boucher testified that she had meals delivered to her when she did not feel well enough to walk to the dining area, and that she did not "go hungry" because of her injury.  (Resp. SAMF ¶ 9; Boucher Dep. at 22-29.) And the defendants interpose their lack of record citation objection/lack of foundation objection.  (Resp. SAMF ¶¶ 8, 9.) [6]

---

[6]      Boucher asserts that in the month of August three incidents took place that prompted her case manager, Donna Berry to go to Hope LeBlance and ask her to see Boucher because it was apparent that her condition was not stable, noting that the correctional officers needed to help Boucher with her daily activities, and that there was a general concern about her.  (SAMF ¶ 10.)  Berry, Boucher insists, was told that she was fine and that she had only

Boucher never saw Dr. Tritch regarding her complaints of back pain.  (SMF ¶ 35; Boucher Dep. at 38:6-12.)   Boucher has sued Dr. Tritch solely because in her mind he was LeBlanc's "boss." (SMF  ¶ 36; Boucher Dep. at 38:12-39:8.)[7]

In July and August of 2005, Debra Smith, R.N. worked in the Women's Center at the Maine Correctional Center, where Boucher was housed. (SMF ¶ 37; Smith Aff. ¶2.)  Smith's role in Boucher's medical care was limited to receiving sick call request slips, triaging complaints, scheduling visits with providers (*e.g.,* doctors and nurse practitioners), and passing out prescribed medications. (SMF ¶38; Smith Aff. ¶3.)  Smith did not have the authority to decide, and she never did decide, that an inmate such as Boucher, presenting with complaints of back pain, would not be seen by a provider. (SMF ¶39; Smith Aff. ¶4. )  Smith always had patients with complaints of back pain seen by providers. (SMF ¶ 40;  Smith Aff. ¶4.)  Smith had no authority to make treatment decisions or referrals for Boucher, and she made no such decisions. (SMF ¶ 41; Smith Aff.  ¶5. )  Smith never ignored a complaint of back pain made by Boucher. (SMF ¶ 42; Smith Aff. ¶6.)

LeBlanc insists she did not deliberately ignore Boucher's complaints. (SMF ¶ 43; LeBlanc Aff. ¶15.)  LeBlanc has never deliberately ignored the complaints of a patient whom she believed to be at risk for serious harm. (SMF ¶ 44; LeBlanc Aff.  ¶14.)

Boucher underwent disc surgery shortly after her release from the Maine Correctional Center in 2005.  (SMF ¶ 45; Boucher Dep. at 62:25-63:3.)  Boucher has never been told by any

---

pulled a muscle.  (Id.) In addition to noting the want of record citation, the defendants respond that this fact is reliant on inadmissible hearsay.  (Resp. SAMF ¶ 10.)

[7]         Boucher notes that the affidavit of Tritch contained his expert opinion that the referral of a patient with complaints of low back pain to an orthopedist or neurosurgeon is indicated when there are features of cauda equine syndrome, including bowel and bladder dysfunction, saddle anesthesia, and bilateral leg weakness and numbness. (SAMF ¶ 2.)  Boucher maintains that she reported to the medical staff at the prison on numerous occasions that her left leg was numb and it remained numb for the last four weeks of her incarceration until she had her operation. (Id.) The defendants point out that this observation is not supported by record citation.  (Resp. SAMF ¶ 2.)

doctor that her condition is worse than it would be if she had undergone surgery sooner than she did.  (SMF ¶ 46;  Boucher Dep. at 63:16-23.)  Boucher's only claim is for the pain and suffering she says she endured as a result of her back surgery not being performed as soon as it should have been. (SMF  ¶ 47; Boucher Dep. at 63:4-64.4.)

### *These Facts in View of the Eighth Amendment Deliberate Indifference Standard*

As to the Eighth Amendment deliberate indifference standard in the context of medical care for inmates, the First Circuit summarized in <u>Ruiz-Rosa v. Rullan</u>:

> For medical treatment in prison to offend the Constitution, the care "must involve 'acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.' " <u>Feeney v. Corr. Med. Servs., Inc.</u>, 464 F.3d 158, 161 (1st Cir.2006) (quoting <u>Estelle v. Gamble</u>, 429 U.S. 97, 105-06 (1976)). Deliberate indifference in this context may be shown by the denial of needed care as punishment and by decisions about medical care made recklessly with "actual knowledge of impending harm, easily preventable." <u>Id.</u> at 162 (internal quotation marks omitted). Deliberate indifference means that "a prison official subjectively 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " <u>Burrell [v. Hampshire County]</u>, 307 F.3d [1,] 8 [(1st Cir. 2002)](quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994)). Therefore, substandard care, malpractice, negligence, inadvertent failure to provide care, and disagreement as to the appropriate course of treatment are all insufficient to prove a constitutional violation. <u>Feeney</u>, 464 F.3d at 161-62.

485 F.3d 150, 156 (1st Cir. 2007); <u>see also</u> <u>Mahan v. Plymouth County House of Corr.</u>, 64 F.3d 14, 18 (1st Cir. 1995).

"'Deliberate indifference' thus defines a narrow band of conduct in this setting." <u>Feeney</u> 464 F.3d at 162.  "The care provided must have been '"so inadequate as to shock the conscience." '" <u>Id.</u> (quoting <u>Torraco v. Maloney</u>, 923 F.2d 231, 235 (1st Cir.1991), in turn quoting <u>Sires v. Berman</u>, 834 F.2d 9, 13 (1st Cir.1987)). Disagreements between an inmate and a medical care provider do not, alone, rise to a level of a constitutional violation.  <u>See</u> <u>Ruiz-Rosa</u>, 485 F.3d at 156.

With respect to this standard, I highlight the following undisputed facts. After Boucher's July 4, 2005, fall, LeBlanc promptly referred her to the Maine Medical Center for evaluation. With respect to that initial evaluation, Boucher was told that the problem was not in her back but mainly in her stomach and did indicate that if problems persisted further imaging might be called for.   In the records of the examinations performed in the Maine Medical Center Emergency Department on July 5, 2005, and on August 30, 2005, there is no indication of any condition that would have constituted a reason for urgent referral to an orthopedist or a neurosurgeon.  Boucher has not created a genuine dispute of fact as to her contentions that she repeatedly complained to the defendants about her condition or an escalation in symptoms prior to whatever led to her August 26, 2005, prescription for Robaxin.[8]  The unsworn complaint allegations and her unsworn representations in her statement of disputed facts are insufficient, particularly in light of this court's efforts to draw Boucher's attention to the oath deficiencies in her complaint and her summary judgment pleadings and the opportunity provided her to supplement the latter to cure the defect.

With respect to the facts supported by record citations and Boucher's interaction with each defendant, Boucher only went to see LeBlanc once regarding her complaints of back pain, and on that day LeBlanc physically examined her.   The back pain Boucher experienced during the time between the onset of her pain and her release from MCC was something LeBlanc ordinarily would have managed conservatively.  Smith always had patients with complaints of back pain seen by providers. Smith never ignored a complaint of back pain made by Boucher. Smith did not have the authority to decide, and she never did decide, that an inmate such as

---

[8]     The "Sick Call Log" submitted by Boucher only supports the fact that she was seen on August 26, 2005, and prescribed Robaxin.

Boucher, presenting with complaints of back pain, would not be seen by a provider. Boucher never saw Tritch regarding her complaints of back pain.

On August 30, 2005, when Boucher presented to the emergency department at Maine Medical Center after her release from the MCC, she was examined, told she was fine, and sent home.  Boucher has never been told by any doctor that her condition is worse than it would be if she had undergone surgery sooner than she did.[9]  Boucher's only claim is for the pain and suffering she says she endured as a result of her back surgery not being performed as soon as it should have been.

There is no basis in this record to draw an inference that any of the named medical defendants addressing Boucher's health care needs denied her medical care as a form of punishment or that they made decisions about Boucher's medical care recklessly with "actual knowledge of impending harm, easily preventable." Feeney, 464 F.3d at 162.  Even if the court were to conclude that there was some basis to infer negligence on the part of one or more of these defendants,  there is simply not be enough in this record to justify sending this case to trial on an Eighth Amendment theory.

### CONCLUSION

For the reasons set forth above, I recommend that the Court grant the defendants' motion for summary judgment.

---

[9]     Boucher represents that she had surgery on her back after her second visit to the Maine Medical Center but she has not submitted any cognizable record evidence regarding this surgery or how it is evidence of any short-fall by the defendants during the July/August period of incarceration.

## **NOTICE**

       A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

       Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

                /s/ Margaret J. Kravchuk
                U.S. Magistrate Judge

August 19, 2009.

15